UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN E. STOTE,                          *
                                        *
            Petitioner,                 *
                                        *
    v.                                  *        Civil Action No. 01-cv-12139-IT
                                        *
GARY RODEN,                             *
                                        *
            Respondent.                 *

ORDER

October 13, 2020

TALWANI, D.J.

I.    Introduction

        Petitioner John E. Stote's petition for a writ of habeas corpus under 28 U.S.C. § 2254

challenges his custody on the grounds that the prosecutor's comments during closing argument

were so unfair as to constitute a denial of due process and that Petitioner's counsel at trial and on

appeal had actual conflicts of interest or potential conflicts that resulted in prejudice. Petitioner's

Re-filed Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in

State Custody ("Second Amended Petition") 3-4 [#63]. For the following reasons, the petition is

DENIED.

II.   Procedural History

        On June 23, 1997, Petitioner was convicted, after a trial, of first degree murder under

theories of deliberately premeditated malice aforethought and extreme atrocity and cruelty.

Supplemental Answer ("S.A.") 7.[1] He appealed his conviction directly to the Supreme Judicial

---

[1] The Supplemental Answer was not scanned "due to its size, or the way in which it was bound."
See Clerk's Notice [#39-1]. As such, it is not available for electronic viewing, but "[t]he original

Court ("SJC") pursuant to M.G.L. c. 278, § 33E. While the appeal was pending, Petitioner was granted leave by a single justice of the SJC to file a motion for a new trial, which he did, arguing that newly discovered evidence in the form of an affidavit from a blood spatter expert corroborated Petitioner's trial testimony that the victim had attacked him. See S.A. 121-125. The trial judge denied the motion. Petitioner appealed the denial and that appeal was consolidated with his direct appeal in front of the SJC. See Commonwealth v. Stote, 433 Mass. 19, 20 (2000) ("Stote I").

In that consolidated appeal, Petitioner argued that, during closing argument, the Commonwealth made improper remarks about his self-defense claim and the victim's lack of involvement in organized crime. See id. at 27-29.[2] The SJC affirmed Petitioner's conviction and the denial of the motion for a new trial and declined to exercise its plenary power under M.G.L. c. 278, § 33E to reduce the degree of guilt. Id. at 20.

Petitioner was represented by John Bryson and William Walsh, Jr., at trial, see S.A. 644, and by Walsh on the motion for a new trial and on the consolidated appeal. See Commonwealth v. Stote, 456 Mass. 213, 214 (2010) ("Stote II").

On December 5, 2001, Petitioner filed a Petition for Writ of Habeas Corpus [#1] with this court (Tauro, D.J.), which was stayed to allow him to exhaust state court remedies. See Report and Recommendations by Ch. Mag. Judge Marianne B. Bowler [#13]; Report and Recommendations by Ch. Mag. Judge Marianne B. Bowler [#16]; Status Report 1 [#18]; Order Adopting Report and Recommendation (July 7, 2003); Order Extending Stay (October 5, 2004).

---

is available for viewing in the Clerk's Office."

[2] Petitioner also argued that he was prejudiced by the prosecution's delayed disclosure of a state police chemist's report, Stote I, 433 Mass. at 22-25, and that the trial court and prosecution had "mishandled" evidence of the victim's alleged involvement in organized crime. Id. at 25-27.

In 2005, the case was closed without judgment pending the resolution of the state court proceedings, to be reopened on the motion of either party. Order for Closure [#24].

Meanwhile, on February 13, 2003, Petitioner, proceeding *pro se*, filed a second motion for a new trial in state court. See Status Report 1 [#18]. On May 27, 2003, represented by current counsel, he filed an amended (second) motion for a new trial raising, among other issues, a claim that Walsh provided ineffective assistance of counsel at trial and on appeal due to conflicts of interest resulting both from his personal relationship with the prosecutor, whom he had dated for two years in a relationship that ended amicably seventeen years prior to the trial, and from his personal relationship with an attorney working in the appellate division of the District Attorney's office, whom he dated while litigating portions of the first motion for a new trial and consolidated appeal.[3] S.A. 11, 537-610. The court denied the motion on November 20, 2003, after a non-evidentiary hearing. S.A. 11, 644.

Petitioner filed a petition for leave to appeal the denial of the amended (second) motion for a new trial with the SJC on December 17, 2003. S.A. 17, 313-364. On February 28, 2005, after a conference, S.A. 18, the single justice allowed the petition "as to the issue of the alleged conflict of interest stemming from defense counsel's relationship with a member of the District Attorney's appellate division during the time that defense counsel was pursuing the defendant's direct appeal and the appeal of the denial of his first motion for a new trial" which could

---

[3] The SJC noted that "[a]lthough the assistant district attorney who was the trial prosecutor also represented the Commonwealth in connection with the defendant's appeal, we refer to her as the 'trial prosecutor' to distinguish her from the assistant district attorney in the appellate division, whom we refer to as an 'ADA,' who did not represent the Commonwealth in connection with prosecuting this defendant, either at trial or on appeal." Stote II, 456 Mass. at 214 n.2. The court adopts the SJC's terminology in reference to the two Commonwealth attorneys with the exception that the "trial prosecutor" is referred to simply as "the prosecutor" in recognition of her role in litigating the appeal.

potentially entitle Petitioner to a new appeal. S.A. 658. On March 5, 2010, the SJC affirmed the

denial of Petitioner's amended (second) motion for a new trial. See Stote II, 456 Mass. at 224.

Petitioner's petition for rehearing was denied on April 28, 2010. S.A. 23.[4]

On June 17, 2010, Petitioner filed a Motion to Reopen Case [#25], which the court allowed

on July 7. Order [#29]. On April 29, 2011, Petitioner filed an Amended Petition Under 28 U.S.C.

§ 2254 for Writ of Habeas Corpus by a Person in State Custody [#34]. Respondent filed a

Motion to Dismiss Because Grounds 12(A)-(B) are Unexhausted and 12(E)-(H) are Time-barred

[#36]. Petitioner filed his Opposition [#49] on July 31, 2012. On September 27, 2013, the court

granted Respondent's Motion to Dismiss [#36] without prejudice to Petitioner amending his

Petition so that it contained no unexhausted claims. Order [#59].

On November 1, 2013, Petitioner filed a Re-filed Amended Petition Under 28 U.S.C.

§ 2254 for Writ of Habeas Corpus by a Person in State Custody ("Second Amended Petition")

[#63] containing two claims, labeled to correspond to the earlier versions of the petition as 12(C)

and 12(D). Claim 12(C) relates to two allegedly improper remarks made by the Commonwealth

at closing argument. Claim 12(D) relates to Attorney Walsh's alleged conflicts of interest.

Petitioner then filed a Motion to Expand the Record [#74] and Motion for an Evidentiary

Hearing [#75] as to his conflicts-of-interest claim, which the court allowed, Order [#78], but then

vacated, Order [#81], and ultimately denied after reviewing further submissions from the parties.

Order [#94]. On May 20, 2014, the case was reassigned. Elec. Notice [#102]. Petitioner

---

[4] Petitioner also filed a renewed amended (third) motion for a new trial on March 10, 2008, S.A. 13, 661-676, which was denied without hearing on March 26, 2008. Id. at 13. On April 18, 2008, Petitioner filed a petition for leave to appeal that denial with a single justice of the SJC, S.A. 24, 751-817, which was denied because it "did not present a new and substantial question which ought to be determined by the full court." Id. at 25, 818-820 (internal quotation and citation omitted).

subsequently filed a <u>Motion for Reconsideration</u> [#120], which the court (Talwani, D.J.) denied.

Order [#127]. Petitioner filed a second <u>Motion for Evidentiary Hearing</u> [#128] as to his conflicts-

of-interest claim, which the court also denied. Order [#140].

In light of continuing disputes between the parties as to what claims were before the

court, the court reviewed the procedural history and determined that only Petitioner's claims

12(C) and 12(D), brought through his <u>Second Amended Petition</u> [#63], remain pending. <u>See</u>

Order [#146]. The parties thereafter submitted briefing. Petitioner's Amended Memorandum in

Support of Amended Petition [#158]; Respondent's Memorandum of Law in Opposition to

Petition for Writ of Habeas Corpus [#159]; Petitioner's Reply to Respondent's Memorandum of

Law [#162]; Petitioner's Motion for Leave to File Supplemental Memorandum in Support of

Petition [#180], treated as a Supplemental Memorandum per Elec. Order [#196].[5] The record

remains "limited to the record that was before the state court that adjudicated the claim on the

merits." <u>See</u> Order [#175] (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)).

The court heard argument on the habeas petition on May 28, 2020.[6]

---

[5] Petitioner also submitted additional exhibits in support of his Petition, <u>see</u> Exhibits [#172], which Respondent moved to strike. <u>See</u> Motion to Strike [#163]. The court denied the motion to strike as to exhibits 1, 3-5, 9-12, 16, and 19-20, which are also contained in the Supplemental Answer and are thus part of the record before both the state and this court, Order 3 [#175], and granted the motion to strike as to exhibits 6, 13-15, and 18, which were previously found inadmissible, <u>id.</u> at 3-4 (citing Elec. Order [#94] and Mem. & Order [#127]), and as to exhibits 7-8 and 17 because they were not part of the record before the state court and Petitioner did not make the required showing for expansion of the record. Order 4-5 [#175].

[6] In light of the disposition here, Petitioner's <u>Motion for Leave to File Petitioner's Motion for Release from State Custody Pending Decision on Amended Petition</u> [#181], <u>Motion for Release from State Custody Pending Decision on Amended Petition and Request for Hearing</u> [#182], <u>Motion for Leave to File Exhibits to Motion for Release from State Custody Pending Decision on Amended Petition</u> [#184], <u>Motion for Immediate Hearing on Petitioner's Motion for Release from States Custody Pending Decision on Amended Petition</u> [#187], <u>Motion for Status Hearing</u> [#189], and <u>Emergency Motion Based on COVID-19 Crisis for Decision on Amended Petition and Motion for Release, or in the Alternative, Motion to Stay Further Execution of Petitioner's Sentence</u> [#191] are denied as moot.

III.   Facts

   A.  The Murder of John Regan

   The SJC held that the jury was warranted in finding following facts:[7]

>       In July, 1994, the defendant purchased a bar in Springfield from the
> victim, John Regan and his brother, James. The defendant made a down payment
> of $80,000 and agreed to make monthly payments of approximately $2,500. The
> defendant soon fell behind in his payments, prompting the victim and James to
> initiate foreclosure proceedings. The resulting auction took place on September
> 27, 1995, where the victim and James repurchased the bar. After this repurchase,
> the victim and the defendant negotiated terms under which the defendant might
> reacquire the bar. The victim's wife testified that the victim and the defendant
> planned to meet at the bar on October 12, 1995, so that the defendant could repay
> what he owed the victim in arrears. On that day, the defendant dropped off his girl
> friend, Denise Arlen, to run errands, and then proceeded to the meeting. The
> defendant testified that at the meeting, after he informed the victim that he did not
> have the money to pay the victim, they engaged in an argument that escalated into
> violence. It ultimately resulted in the defendant stabbing the victim to death in the
> office of the bar. The defendant testified that he did so in self-defense, after the
> victim became belligerent and irate about the money, told the defendant, "I am
> going to teach you the last lesson of your life," and struck him on the shoulder
> with a baseball bat.

>       After the killing, the defendant grabbed the murder weapon and fled the
> scene to pick up Arlen. He confessed to her that he had killed the victim in self-
> defense. Arlen testified that the defendant looked "shaken up" and "scared." The
> defendant and Arlen opted not to go to the police because the defendant feared the
> victim's alleged associations with organized crime, and they felt that no one
> would believe them. Instead, the defendant disposed of the murder weapon and

---

[7] See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); Companonio v. O'Brien, 672 F.3d 101, 109 (1st. Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)); Torres v. Dennehy, 615 F.3d 1, 5 (1st Cir.2010), cert. denied, 562 U.S. 1189 (2011). "The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." Teti v. Bender, 507 F.3d 50, 58 (1st Cir. 2007), cert. denied, 128 S. Ct. 1719 (2008) (internal quotation and citation omitted); see also Clements v. Clarke, 592 F.3d 45, 47 (1st Cir. 2010), cert. denied, 561 U.S. 1014 (2010) ("Any state court factual findings are presumed to be correct. This deference extends to findings by all state tribunals, whether trial or appellate." (internal citation omitted)). Respondent adopts the SJC's version of the facts. See Resp.'s Mem 7-10 [#159]. Petitioner does not include a statement of the facts in his Amended Memorandum [#158], but has previously adopted the SJC's summation in Stote I of the "evidence produced at trial." Pet.'s Opp'n to Resp.'s Mtn. to Dismiss [#49].

both the defendant and Arlen parked the victim's car in a Hartford, Connecticut, garage. The defendant then borrowed a station wagon from his sister's friend and used it to dispose of the victim's body in the Connecticut River. Meanwhile, Arlen returned to the bar and began to clean the blood from the incident. On his return, the defendant joined Arlen, and together they cleaned the entire bar, including the office, using bleach and other chemicals. The following morning, they returned to the bar to finish cleaning. While they were cleaning, the victim's son came to the bar and knocked on the windows of the bar. The son testified that when he asked the defendant if the defendant had seen the victim, the defendant replied that he had not seen the victim since the previous afternoon.

After Arlen and the defendant finished cleaning, they left for a wedding in Cape Cod. En route, they dumped the bloody towels, which they had used to clean the bar, at a fast food restaurant near Route 495. On October 14, 1995, the defendant called the victim's home. He spoke with both the victim's wife and daughter, and told them that he had heard the victim was missing, but did not know where the victim was. He also told them that he had paid the victim $20,000. Within an hour, he called for a second time and stated that he had paid the $20,000 in cash.

On that same day, after the defendant returned to Springfield, a police officer questioned him about the victim's whereabouts. The defendant gave the police a statement indicating that he had met with the victim on October 12, 1995, paid his debt of $20,000 in exchange for the liquor license and keys to the bar, and parted with the victim on good terms. While giving this statement, he wore a tank top that exposed large portions of his upper torso. The officer who took his statement did not notice any signs of bruising or other injuries to the defendant's torso.

On May 26, 1996, nearly seven months after the victim had last been seen, his body was discovered in the Connecticut River. The forensic pathologist testified that the victim had sustained ten stab wounds, had two defense wounds on his hand and elbow, and that the cause of death was multiple stab wounds.

Stote I, 433 Mass. at 20-21.

B.  Defense Attorney Walsh's Personal Relationships

The SJC found[8] the following facts:

---

[8] The SJC noted that "[o]rdinarily, we accord special deference to the factual findings of a judge who ruled on the defendant's motion for a new trial where, as here, the motion judge also presided at the defendant's trial. Here, however, the judge denied the second motion based on the papers, ruling that the affidavits did not raise an issue warranting an evidentiary hearing. Furthermore, in this case, the facts advanced at trial and the credibility of the witnesses who testified at trial—the key matters as to which we defer to the judge—are immaterial to the question whether Stote received the effective assistance of counsel on appeal. In these

While he was representing Stote, Walsh and the ADA attended a concert together in late March, 1999, and began dating, seeing each other on weekends, until approximately April, 2000. When this relationship began, Walsh had already prepared and filed Stote's first motion. During the course of Walsh's relationship with the ADA, the first motion was denied after a nonevidentiary hearing, and Walsh prepared and, possibly, filed Stote's appellate brief.[9] The relationship between Walsh and the ADA ended before the Commonwealth filed its appellate brief and before oral argument took place. In his own affidavit, Stote attests that the relationship was not disclosed to him and that if he had known of the relationship, he would not have had Walsh represent him.

The affidavits of Walsh and the ADA reveal the following facts about the nature of their relationship. The ADA attests in her affidavit that she and Walsh did not live together at any time during their relationship. Walsh similarly attests that they lived separately. The ADA also states that she does not know whether the relationship was "monogamous." Although neither affidavit states whether the relationship was sexual, we can safely assume that it was, given that the relationship lasted more than one year, the participants were mature adults, neither of them has denied it, and the ADA's reference to a "monogamous" relationship implies as much. The ADA further states that Walsh did not bring legal work to her home, did not to her knowledge receive telephone calls at her home regarding legal matters, and did not discuss Stote's case with her or disclose confidential information to her. She states that, while she and Walsh were seeing each other, they did not "substantively" discuss their "respective legal concerns"[10] and that their work did not "overlap in any respect." Although she was aware that Walsh was working on "an appellate brief," she did not know of its contents, and "even if" she knew the defendant's name "at that time," she did not know anything about Stote's case until she read our 2000 opinion, which was issued after the relationship ended. Walsh similarly attests that he did not discuss Stote's case or appeal with the ADA and that he did not disclose any confidential information to her. Shortly after the relationship ended, according to the ADA's affidavit, Walsh began living with another woman whom he later married.

The ADA's affidavit also indicates that she did not participate in the preparation of the Commonwealth's brief in Stote's appeal. The trial prosecutor, in her affidavit, attests that she alone wrote the Commonwealth's opposition to Stote's first motion and, later, the Commonwealth's appellate brief without the

---

[9] In a footnote, the SJC added that their "records indicate that Stote's appellate brief was filed on April 14, 2000. It is not clear from the affidavits whether the relationship between Walsh and the ADA ended before the brief was filed." Stote II, 456 Mass. at 215 n.5.

circumstances, we are in as good a position as the judge to assess the documentary record underlying his decision on the second motion." Stote II, 456 Mass. at 215 (internal quotations and citations omitted).

[10] In a footnote, the SJC added that "[t]he affidavit is unclear as to any 'legal concerns' that may have been discussed." Stote II, 456 Mass. at 216 n.6.

assistance of anyone in the district attorney's office, other than submitting the brief to her superiors for approval. The trial prosecutor further states that she did not discuss any aspect of the Stote case with the ADA.

Although, in accordance with the single justice's decision, we do not consider whether Stote is entitled to a new trial due to any alleged conflict of interest arising from Walsh's previous relationship with the trial prosecutor, some facts concerning that relationship are relevant to our decision. In 1979 and 1980, Walsh and the trial prosecutor dated, but lived separately.[11] Their dating relationship[12] ended amicably in 1980, some seventeen years before Stote's trial. Walsh and the trial prosecutor maintained a cordial and professional relationship

---

[11] In a footnote, the SJC added "Stote asserts that Walsh and the trial prosecutor, contrary to their affidavits, did in fact live together. In support of this assertion, he relies on an affidavit executed by a member of the Massachusetts bar and submitted in support of the third motion. That affidavit is not properly part of the record before us. In any event, if true, that fact would not affect our conclusion for the reasons explained infra." Stote II, 456 Mass. at 216 n.7 (internal citations omitted).

[12] Petitioner contests the characterization of the relationship between Walsh and the prosecutor as a "dating relationship" Pet.'s Am. Mem. 28 [#158]. "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Respondent argues that Petitioner's challenge must fail because "'[d]escribing how different parties stated different versions of events' is not clear and convincing." Pet.'s Opp'n. 10 n.4 [#159]. This court has already held that "no evidentiary hearing on 'the true nature of the relationship' between Walsh and the trial prosecutor is necessary because it is undisputed that the relationship—whatever its nature— ended seventeen years before Petitioner's trial." Memorandum and Order Denying Motion for Reconsideration 5 [#127]. Petitioner points to "the Schubert and Cockoros affidavits" as evidence that the relationship was "more akin to a common-law-marriage." Pet.'s Am. Mem. 28 [#158]. The affidavit of investigator Nicholas Cockoros was included in the information reviewed by the state court as part of Petitioners second motion for a new trial and, further, contains only unattributed hearsay as to the relationship between Walsh and the prosecutor. See S.A. 614. The affidavit of Greg T. Schubert, Esq., filed in support of Petitioner's third motion for a new trial, states that he "personally know[s] (factually) that" that Walsh and the prosecutor "did cohabit" because Schubert's office was across the street from "their apartment" and he observed them "leaving and returning to their apartment together, often both mornings and evenings." S.A. 749-750. This is the affidavit referenced by the SJC at footnote 7 in Stote II. See supra note 11. The court notes that Attorney Schubert's observations are not inconsistent with current counsel's hearsay account of Walsh's assertion, which was filed in support of the amended second motion for a new trial, that Walsh would, on occasion, spend the night at the prosecutor's home. See S.A. 634. Petitioner has not presented clear and convincing evidence rebutting the presumption of correctness afforded to the state court's factual determinations. Moreover, the distinction Petitioner is trying to draw would not affect the opinion of the court. See infra note 31.

thereafter. Both Walsh and the trial prosecutor eventually went on to marry others, in Walsh's case, as stated above, after his relationship with the ADA ended.

Stote II, 456 Mass. at 215-17.

IV.   Analysis

A.   12(C): The Commonwealth's Comments at Closing Argument

Petitioner argues that "[t]he Commonwealth's closing argument violated the petitioner's rights to due process of law and fundamental fairness in that the Commonwealth argued that the victim was not involved in organized crime and that there was ridiculous evidence of self defense which insulted the jury's intelligence."[13] Second Amended Petition 3 [#63]. Respondent contends that this court's review of that claim is barred because the SJC rejected it on the adequate and independent state-law ground of procedural default. Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp.'s Opp'n") 12-19 [#159].

The doctrine of procedural default, which is "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism," provides that "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule" where that rule "is a nonfederal ground

---

[13] To the extent that Petitioner, in his Amended Memorandum in Support of Amended Petition and Request for Hearing [#158], expands the scope of this claim beyond the two comments challenged on direct appeal to the rest of the closing argument, such expansion is not permitted. Claims that are not brought in the habeas petition are waived, See Logan v. Gelb, 790 F.3d 65, 70 (1st Cir. 2015), because "[i]t is the petition for a writ of habeas corpus, not subsequently filed memorandum, which defines the claims for habeas relief." Smiley v. Maloney, 2003 WL 23327540, *16 n. 39 (D. Mass. 2003); see also Rule Governing Section 2254 Cases in the United States District Courts 2(c) ("The petition must…specify all the grounds for relief available to the petitioner…"). Moreover, such additional claims have not been exhausted. See Janosky v. St. Amand, 594 F.3d 39, 50 (2010) ("In order to exhaust a federal claim, a petitioner must present that claim "fairly and recognizably" to the state courts.")

adequate to support the judgment and the rule is firmly established and consistently followed."
Martinez v. Ryan, 566 U.S. 1, 9 (2012).

Here, Petitioner did not object at trial to the prosecutor's closing argument, leading the SJC to find that "[f]ailure to object to the closing and to ask for a curative instruction waives the right to claim error on appeal, limiting our inquiry to whether the prosecutor's statements are such that they create a substantial likelihood of a miscarriage of justice." Stote I, 433 Mass. at 27 (quoting Commonwealth v. Marquetty, 416 Mass. 445, 450 (1993)). The First Circuit has held, "with a regularity bordering on the monotonous, that the Massachusetts requirement of contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." Hodge v. Mendonsa, 739 F.3d 34, 44 (1st Cir. 2013) (quoting Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2013)); see also Gunter v. Maloney, 291 F.3d 74, 79 (1st Cir. 2002) (finding that Massachusetts courts "regularly enforce[] the rule that a claim not raised is waived"). Moreover, "'miscarriage of justice' review by the SJC where there has been procedural waiver below does not mean that the state does not adhere to its contemporaneous objection rule or that the procedural waiver is not an independent and adequate state ground." Simpson v. Matesanz, 175 F.3d 200, 209 (1st Cir. 1999). Petitioner's claim as to the closing argument is procedurally defaulted.

However, a federal habeas court may reach the merits of a procedurally defaulted claim where the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

1.   Cause and Prejudice

Petitioner argues that trial counsel's[14] failure to object to the prosecution's closing

argument rises to the level of ineffective assistance of counsel, Pet.'s Am. Mem. 18 [#158],

which would constitute cause for the procedural default. See Coleman v. Thompson, 501 U.S.

722, 753-54 (1991); see also Horton v. Allen, 370 F.3d 75, 81 (1st Cir. 2004); Burks v. Dubois,

55 F.3d 712, 717 (1st Cir. 1995). Counsel is constitutionally ineffective where "counsel's

representation fell below an objective standard of reasonableness" and "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id at 694.

On its "miscarriage of justice" review, the SJC examined the two challenged comments

made by the prosecution at closing argument. See Stote I, 433 Mass. 28-29. As to the first, it

reasoned:

> …[T]he prosecutor suggested that, when dealing with the defendant's
> delinquency in making payments in the past, the victim always sought legal
> recourse via lawful channels. She then rhetorically asked, "Does that sound like
> something mob-connected?" We note that during his argument, defense counsel
> had insinuated that the victim and his "friends" posed a serious threat to the
> defendant. Accordingly, the prosecutor limited her argument to respond to this
> implication…

Id. at 28. The SJC then found that it was "'not error for the prosecutor to provide a fair,

unemotional response to defense counsel's arguments." Id. (quoting Commonwealth v. Duguay,

430 Mass. 397, 404 (1999)). This court concurs that it was not ineffective assistance for trial

counsel not to object to this limited remark responding to defense counsel's argument.

As to the second challenged comment, the SJC wrote:

---

[14] Petitioner identifies only Walsh in his ineffective assistance allegations, but John Bryson was
lead counsel for Petitioner at trial and made the defense's closing argument. See S.A. 2713-43.

> [T]he prosecutor argued that there was "ridiculous evidence of self-defense ... it insults your intelligence." The reference was an unnecessary characterization, and came very close to crossing the line of a permissible "comment on evidence developed at trial." Nevertheless, given the judge's instructions, the defendant's failure to object to the comments at trial,[15] the prosecutor's entire argument, and the weight of the Commonwealth's case, the comment did not create a substantial likelihood of a miscarriage of justice.

Stote I, 433 Mass. 28-29 (internal citations omitted). In footnote 9, the SJC adds that "[t]he judge gave clear instructions as to the nonevidentiary role of closing arguments, and what does and does not constitute evidence. He also properly instructed on the issue of self-defense, and stressed the Commonwealth's burden of proving beyond a reasonable doubt that the defendant did not act in self defense." The court concurs with the SJC's characterization of the trial judge's instructions. Prior to the first closing argument, he reminded the jury that "the arguments of the attorneys are not evidence." S.A. 2713. After the arguments, he gave a thorough instruction on the jury's role as fact-finder, see id. at 2765-66 ("So if, for example, in the course of final arguments…either counsel gave you an impression as to how they think you ought to find the facts or expressed their own personal opinions to you or talked abut things which you don't recall from the testimony, then ignore it…You alone, decide the weight and the effect and the value of the evidence and the credibility of the witnesses."), and an extensive instruction on the law of self-defense. See id. at 2787-92 ("If the Commonwealth has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, then you must find him not guilty"). To the extent the prosecution's comment "came very close to crossing the line," the trial

---

[15] In a footnote, the SJC cites to Commonwealth v. Mello for the proposition that "[t]he fact that the defendant did not object, '[a]lthough not dispositive of the issue ... is some indication that the tone [and] manner ... of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.'" 420 Mass. 375, 380 (1995) (quoting Commonwealth v. Toro, 395 Mass. 354, 360 (1985)).

judge's instructions cured the error despite the lack of objection. Thus, it is not the case that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[16] See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Even assuming counsel's representation did fall below an objective standard of reasonableness,[17] Petitioner has not established that his counsel was constitutionally ineffective where no prejudice resulted from counsel's failure to object to the closing argument and, thus, has not established cause for the procedural default.

### 2.   Fundamental Miscarriage of Justice

Petitioner argues that he is actually innocent and, thus, the court must reach the merits of his claim that the prosecution's closing argument made the trial fundamentally unfair. Pet.'s Am. Mem. 45-47 [#158]; Pet.'s Reply 12 [#162]. A federal habeas court may reach the merits of a procedurally defaulted claim where the petitioner can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice,"[18] Coleman v. Thompson, 501 U.S. 722, 750 (1991), which means "the conviction of one who is actually innocent."  Murray v.

---

[16] The court notes that, on the merits, the question is whether the prosecution's closing comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations omitted). The inquiry must be made in the context of the entire proceeding, and not viewing the comments in isolation. See United States v. Young, 470 U.S. 1, 1-12 (1985). Where there is no reasonable probability that the failure to object to the prosecution's argument changed the outcome of the trial, it is unlikely the court would find that the comments, in the context of the entire proceeding, made the trial fundamentally unfair.

[17] The Supreme Court has held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland v. Washington, 466 U.S. 668, 697 (1984).

[18] The First Circuit has held that "the SJC's decision on what is a miscarriage of justice is a determination made under state law and does not answer the habeas question under federal law of whether there is actual innocence." Simpson v. Matesanz, 175 F.3d 200, 210 (1st Cir. 1999) (internal citation omitted).

<u>Carrier</u>, 477 U.S. 478, 496 (1996); <u>see also</u> <u>Simpson v. Matesanz</u>, 175 F.3d 200, 210 (1st Cir. 1999) ("It is clear that for habeas purposes the federal 'fundamental miscarriage of justice' standard means that petitioner must establish actual innocence").

The Supreme Court instructs that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995), and demonstrate that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u> at 327. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." <u>Id.</u> at 324. Indeed, as the First Circuit has noted, "[t]his exception is quite narrow and seldom used." <u>Simpson v. Matesanz</u>, 175 F.3d 200, 210 (1st Cir. 1999).

The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." <u>Schlup</u>, 513 U.S. at 328. Petitioner has provided the affidavit of a blood spatter expert, Norman Reeves,[19] which was the basis of his first motion for a new trial, an affidavit from Dr. Albert Harper, Director of the Henry C. Lee Institute of Forensic Science,[20] filed in support of Petitioner's third motion for a new trial, and an affidavit

---

[19] The trial judge, in denying Petitioner's first motion for a new trial, noted that he was "not persuaded that the Reeves evidence may properly be classified as 'newly discovered'" but addressed its import nonetheless. S.A. 124. This court does the same.

[20] Petitioner ultimately filed three affidavits from Dr. Harper. The first was included with his second motion for a new trial and addresses the investigatory steps trial counsel did not take, S.A. 641-643. The second affidavit of Dr. Harper is entitled "Affidavit of Albert B. Harper in Support of Defendant's Motion for the Commonwealth to Produce Duplicate Copies of Crime

from investigator Nicholas Cockoros, filed in support of Petitioner's second motion for a new trial. The court has also reviewed the testimony of Sergeant Alben given during voir dire.[21]

The affidavit of blood spatter expert Norman Reeves' most exculpatory note is that "[t]he shape, size, location and directionality of the bloodstains observed in the office area (excluding the wooden pallet), and described, are compatible with blood leaving the victim's arms consistent with the arms swinging with force. The action of the victim's arms to leave such blood stains is not unlike the actions being described by Defendant Stote of the victim swinging a bat while bleeding." S.A. 119. This comment is followed by three paragraphs detailing the insufficiency of the police forensic documentation, including that the "photographs do not accurately depict the relationship of the directionality of the bloodstains to the likely sources of these bloodstains" such that the "documentation of the evidence in this case prevent the undersigned from making determinations in such detail as to accurately determine the origin of the source of the bloodstains," and that, although "[d]etailed photographs with measuring devices present and overall photographs of the areas of the blood staining…are the norm for a scene such as this," but "[t]he Commonwealth did not use those techniques." S.A. 120. In the Memorandum

---

Scene Photo's [sic] Specificly [sic] Those Showing Blood Splatter in the Office," S.A. 745-46, but is included in the portion of the Supplemental Answer identified as "Memorandum of Law in Support of Defendant's Renewed Amended [Third] Motion for a New Trial." See S.A. 3. It requests additional access to certain evidence. S.A. 745-56. The third affidavit was also filed in support of Petitioner's third motion for a new trial and addresses Dr. Harper's conclusions based on his review of the evidence. S.A. 746-47. The court has reviewed all three and finds only the third relevant to the question of actual innocence.

[21] Defendant's second motion for a new trial was also accompanied by affidavits from Petitioner's fiancé, Denise Arlen, S.A. 616-618, Petitioner's mother, Frances M. Stote, S.A. 619-624, Petitioner himself, S.A. 625-631, and current counsel Bernard Grossberg, Esq. S.A. 632-640. To the extent the affidavits provide any evidence of actual innocence, none of the included information relevant to an innocence analysis can be reasonably said to have "become available only after trial." See Schlup v. Delo, 513 U.S. 298, 328 (1995).

of Decision on Defendant's Motion for a New Trial, the judge wrote: "Reeves' evidence would add very little to the defense case. The defendant was effectively impeached at trial concerning his testimony that the victim attacked him and that he responded by utilizing self-defense." S.A. 123. This court agrees that testimony that the victim forcefully swung his arms after being stabbed would not have added much to the defense.

The third affidavit of Dr. Harper attests to his opinion that, having reviewed, among other documents, the trial transcripts, affidavit of Norman Reeves, and autopsy report of John Regan, see S.A. 642, 747, as well as "the physical evidence and photographs entered as evidence in the trial," the injuries on Regan's left hand and arm and the "blood stain patterns" found in the office "are consistent with" Petitioner's testimony that Regan attacked him with a baseball bat, and that "had the defendant's trial attorneys conducted a complete review of the physical evidence and presented the testimony of an expert, such as Norman Reeves, the jury would have heard evidence consistent with" Petitioner's account of events. S.A. 747-48. Having found that the Reeves evidence would add very little to the defense case, the court finds the same regarding the forensic review by Dr. Harper, and further notes that Petitioner has not demonstrated that this information constitutes evidence unavailable at trial.

The affidavit of investigator Nicholas Cockoros similarly does very little to support Petitioner's claim of actual innocence.[22] It alleges that Regan "was an associate of the Genovese

---

[22] The court notes that the trial judge, in ruling on the second motion for a new trial, indicated that information provided in the Cockoros affidavit as to Attorney Walsh's lack of trial experience was "demonstrably untrue" based on the trial judge's personal recollection "as a sitting judge." S.A. 645. He also "decline[d] to draw the inference which defense counsel has asked [him] to draw" from the affidavit, id. at 654, that "the prosecution had a sinister motive for objecting to the introduction of" evidence of Mr. Regan's "alleged involvement with organized crime," id. at 652, and "consider[ed] his smear tactics in this regard to be irresponsible." Id. at 654.

crime family; however, he was not designated a 'Made Man.'" S.A. 611. As support, the

affidavit refers to a "Massachusetts State Police Application For A Search Warrant…attached

hereto as Exhibit B," which is not before this court, and indicates that Cockoros "provided [his]

investigation notes and the identities of [his] sources to Attorney Bernard Grossberg for his in-

camera filing of subsidiary facts." S.A. 615. There is no indication that notes were filed or

sources revealed. Petitioner has also not identified any reason that the information in the

affidavit, if accurate, was not reasonably available at trial. Moreover, it does not speak to

Petitioner's knowledge of Regan's associations at the time the events in question took place.[23]

Finally, the court has reviewed the testimony of Sergeant Alben at the voir dire and

during the defense's case in chief and agrees with the SJC that "the limitations on Alben's

testimony did not weaken the defendant's case in some significant way." Stote I, 433 Mass. at 27

n.7 (internal quotation and citation omitted). As that court noted, "Alben never testified at the

voir dire that the victim was a *member* of organized crime. Indeed, it does not appear from the

transcript of the voir dire that Alben was prepared to say more than that the victim had close

associations with organized crime." Id. (emphasis in original). [24] The observations on which

---

[23] In analyzing the excluded testimony of Sergeant Alben as to Regan's criminal history, the SJC highlighted that "the defendant has made no showing that, at the time of the killing, he was aware of either the arrest or the raid. Thus, these factors could not have substantiated the defendant's theory that he feared the victim's organized crime connections." See Stote I, 433 Mass. at 27 n.7.

[24] During voir dire, Sergeant Alben stated that, based on his observations of Mr. Regan, he "came to the conclusion that he was associated with organized crime." S.A. 2539 [#39-1]. When the court inquired as to Mr. Regan's "reputation in the law enforcement community," Sergeant Alben responded: "Only for his associations, Judge, with persons who were the focus of investigations. In other words, he was friendly with a number of these people. I think that's the only reputation that I could say." Id. at 2552-52.

Alben based his conclusion that the victim had such associations, and Petitioner's own basis for believing the victim had friends involved in organized crime, were presented to the jury.[25]

This information, considered collectively and in light of the evidence presented at trial, does not lead the court to conclude that "it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." See Schlup v. Delo, 513 U.S. 298, 327 (1995). As such, Petitioner has failed to demonstrate a sufficient likelihood of actual innocence to justify the court in reaching the merits of his procedurally defaulted claim.

B. 12 (D): Walsh's Relationships With the Prosecutor and the ADA[26]

Petitioner argues that his "rights to counsel were violated by actual conflicts of interest created by counsel's undisclosed intimate relationship with the trial prosecutor[27] [] and compounded by his relationship with another prosecutor [] in the Appellate Division of the District Attorney's Office while counsel represented him on an initial motion for new trial and appeal. If the relationship between counsel and the prosecuting assistant district attorney did not amount to an actual conflict of interest, it certainly constituted a potential conflict of interest, which prejudiced the petitioner." Second Amended Petition 4 [#63].

---

[25] On direct examination during the defense's case in chief, Sergeant Alben describes the four occasions on which he personally observed Mr. Regan in the company of men he knew to be involved with organized crime, including Albert Scibelli. See id. at 2643-46. Petitioner later testified to observing Mr. Regan in the company of Mr. Scibelli, saying "I think they're very close friends, yes." Id. at 2575-76.

[26] To the extent that Petitioner attempts to expand the scope of this claim beyond counsel's relationships with the prosecutor and the ADA in his Amended Memorandum in Support of Amended Petition and Request for Hearing [#158], such expansion is not permitted. See note 13, supra.

[27] The trial prosecutor also represented the Commonwealth on appeal and is referred to by the court simply as "the prosecutor."

This court has already found that both of these claims were adjudicated on the merits in state court.[28] Mem. & Order Denying Mtn. for Reconsideration 2-3 [#127]. As such, under the Antiterrorism and Effective Death Penalty Act (AEDPA), Petitioner merits relief if the state court decision was "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Brumfield v. Cain, 135 S. Ct. 2269, 2275 (2015) (quoting 28 U.S.C. §§ 2254(d)(1), (2)). "A state court decision is contrary to clearly established federal law if it contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but reaches a different result." Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012) (internal quotation and citation omitted). A state court decision involves an "unreasonable application" of established law where "it correctly identifies the governing legal rule but applies that rule unreasonably to the facts" in front of it in a manner "so lacking in justification" that it is "beyond any possibility for fair-minded disagreement." White v. Woodall, 134 S. Ct. 1697, 1702, 1706 (2014). The state court must have made more than a "clear error." Id. at 1702. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Harrington v. Richter, 562 U.S. 86 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). A state court decision is "based on an unreasonable determination of the facts" if it is "objectively

---

[28] A state court is deemed to have adjudicated a case on the merits without ever citing to or even being aware of the Supreme Court's jurisprudence on the issue. See Harrington v. Richter, 562 U.S. 86, 98 (2011). The First Circuit has held that "a state court may decide a federal constitutional claim by reference to state court decisions dealing with federal constitutional issues." Hodge v. Mendonsa, 739 F.3d 34, 41 (internal quotation and citation omitted).

unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v.</u>

<u>Cockrell</u>, 537 U.S. 322, 340 (2003).

The Sixth Amendment's guarantee of the assistance of counsel exists "not for its own

sake, but because of the effect it has on the ability of the accused to receive a fair trial." <u>Mickens</u>

<u>v. Taylor</u>, 535 U.S. 162, 166 (2002) (quotation and citation omitted). Therefore, "defects in

assistance that have no probable effect upon the trial's outcome do not establish a constitutional

violation." <u>Id.</u> A petitioner alleging a Sixth Amendment violation generally must demonstrate "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 694. However, pursuant to

<u>Cuyler v. Sullivan</u>, a petitioner "who shows that a conflict of interest actually affected the

adequacy of his representation need not demonstrate prejudice in order to obtain relief…In order

to demonstrate a violation of his Sixth Amendment rights, a [petitioner] must establish that an

actual conflict of interest adversely affected his lawyer's performance." 446 U.S. 335, 349-50

(1980) (internal citation omitted). "In order to show an actual conflict of interest, a [petitioner]

must show that (1) the lawyer could have pursued a plausible alternative defense strategy or

tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken

due to the attorney's other interests or loyalties." <u>U.S. v. Colon-Torres</u>, 382 F.3d 76, 88 (2004)

(citing <u>U.S. v. Soldevila-Lopez</u>, 17 F.3d 480, 486 (1994)).

An ineffective assistance of counsel claim is a mixed question of law and fact, <u>Strickland</u>,

466 U.S. at 698, such that Petitioner must demonstrate that the state court's decision was an

unreasonable application of clearly established Federal law. <u>See</u> <u>Teti v. Bender</u>, 507 F.3d 50, 57

(1st Cir. 2007) (citing <u>Terry Williams v. Taylor</u>, 529 U.S. 362, 409 (2000) (mixed questions are

reviewed under § 2254(d)(1)'s "unreasonable application" clause)).

1.  Relationship with the Prosecutor

A Single Justice of the SJC denied leave for Petitioner to appeal his claim that Walsh's

past relationship with the prosecutor, which ended amicably seventeen years before the trial,

created either an actual conflict of interest or a potential conflict by which Petitioner was

prejudiced. S.A. 656-657. Finding that the issue was "new" but not "substantial,"[29] the Single

Justice wrote:

> The motion judge (who was also the trial judge) determined that that prior
> relationship did not pose any actual conflict of interest during the time that
> counsel represented the defendant, and that the defendant had failed to
> demonstrate that his counsel's judgment had been impaired in any way by that
> prior relationship…While there are some types of conflicts that are not
> ameliorated by the passage of time, the defendant points to no precedent
> suggesting that this kind of relationship is one that would permanently give rise to
> any risk of divided loyalty. The judge's assessment comports with common
> experience and common sense, namely, that the passage of time and intervening
> relationships with other persons would suffice to dissipate whatever feelings
> might have remained from a dating relationship that was amicably terminated that
> long ago. And, given the detail in the affidavits before him (cf. *Commonwealth v.*
> *Croken*, 432 Mass. 266, 275-276 [2000]), the judge had an ample basis for
> deciding this issue without an evidentiary hearing.

Id. at 657.

Petitioner argues that the state court misapplied established federal law because, without

an evidentiary hearing, it could not have evaluated the true nature of Walsh's relationship with

the prosecutor. Petitioner also asserts that the finding that Walsh's relationship with the

prosecutor was "only a 'dating relationship'" is open to question,"[30] and that, if, instead, it was

---

[29] A "single justice's determination that an issue is not 'new' within the meaning of § 33E is
tantamount to a finding of procedural default, the classic example of an independent and
adequate state ground. But…[a] determination that the issues are 'new' and simply not
'substantial' resolves the claims on the merits and does not signal procedural default." Lee v.
Corsini, 777 F.3d 46, 55 (1st Cir. 2015) (internal quotations and citations omitted).

[30] See supra note 12.

"more akin to a common-law-marriage,"[31] the state court applied the wrong standard because "upon a showing of an 'actual or genuine' conflict of interest…the Sixth Amendment requires that a defendant only show adverse effect." Pet.'s Am. Mem. 28-29 [#158] (citing Mickens v. Taylor, 535 U.S. 162, 168 (2002)). Finally, he argues, in the alternative, that Walsh's relationship with the prosecutor created a potential conflict that resulted in actual prejudice where Walsh did not personally investigate the crime scene, Pet.'s Am. Mem. 33-43 [#158], did not consult a forensic expert, id., and did not object to the prosecutor's closing argument, the court's instructions, or the amendment of the indictment to include felony murder. Id. at 18.

Having reviewed the affidavits of Walsh, S.A. 824-25, the prosecutor, id. at 821-23, the ADA, id. at 826-27, and investigator Nicholas Cockoros,[32] id. at 611-615, as well as current counsel's own affidavit recounting information learned from Walsh during December 2001 and February 2002 interviews,[33] id. at 632-640, the court does not find the Single Justice's holding that this claim failed to raise a substantial issue to be an unreasonable application of federal law

---

[31] Review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011); see also Memorandum and Order Denying Motion for Reconsideration [#127]. To the extent Petitioner asserts that the state court improperly characterized Walsh's relationship with the prosecutor as a "dating relationship," see supra note 12, the court notes that a passage of seventeen years could reasonably be found to ameliorate the concerns of the relationship even if it had included some cohabitation. See Memorandum and Order 6 [#127].

[32] Cockoros asserts, without attribution, that Walsh and the prosecutor "lived together for a period of several years," which contradicts their own affidavits as well as the affidavit of current counsel and is unsubstantiated hearsay. S.A. 614.

[33] Current counsel's account of his interviews with Walsh indicates that Walsh told him that he would "on occasion…spen[d] the night" at the prosecutor's home. Although this is not inconsistent with Walsh and the prosecutor's accounts in their own affidavits, it is, as noted by the Single Justice, hearsay. S.A. 646.

"so lacking in justification" that it is "beyond any possibility for fair-minded disagreement."[34]
See White v. Woodall, 134 S. Ct. 1697, 1702, 1706 (2014).

As to the decision to eschew an evidentiary hearing, the Single Justice correctly points out that the affidavits from Walsh, the prosecutor, and the ADA "address the very issues" not addressed by the affidavits in Commonwealth v. Croken, 432 Mass. 266 (2000), the case Petitioner cited as precedent. S.A. 648-49. As to the existence of an actual conflict[35] or a potential conflict[36] resulting in errors that rose to the level of ineffective assistance, the Single Justice noted the Superior Court judge's observation that Walsh "had no hesitation whatsoever in lambasting [the prosecutor] for her transgressions at trial," see id. at 651, and the SJC similarly remarked that "[m]uch of [its] opinion in Stote's direct appeal is devoted to disposing of Walsh's charges concerning the trial prosecutor's conduct of the trial." Stote II 456 Mass. at 223. It was not an unreasonable application of the law for the Single Justice to find that, whatever Walsh's

---

[34] The court takes note of the Supreme Court's decision in Williams v. Pennsylvania, 136 S. Ct. 1899 (2016), which Petitioner highlights in his Motion for Leave to File Limited Supplemental Memorandum in Support of Petition 3-5 [#180] to argue that "[t]he passage of time alone cannot ameliorate a specific incident of a conflict." In Williams, the Court held that it was a violation of due process for a state high court justice who "had been the district attorney who gave his official approval to seek the death penalty in the prisoner's case" to deny the prisoner's motion for recusal and participate in the decision to deny relief. The court found that "[t]he involvement of multiple actors and the passage of time do not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion." Id. at 1907. The considerations in this case are not analogous.

[35] The First Circuit has found that, on the issue of actual conflict of interest, Massachusetts "state law is explicitly more favorable to defendants than the federal standard," so the court should "presume the federal law adjudication to be subsumed within the state law adjudication." See Teti v. Bender, 507 F.3d 50, 56 (2007) (internal quotation and citations omitted).

[36] An ineffective assistance analysis conducted pursuant to Massachusetts' state precedents is "a functional equivalent" to an analysis under federal law. See Ouber v. Guarino, 293 F.3d 19, 44 (1st Cir. 2002).

failings as one of two defense attorneys at trial may have been, they were not the result of "competing loyalties."[37] See Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007).

2.   Relationship with the Assistant District Attorney

Petitioner argues that Walsh's relationship with an attorney in the appellate division of the District Attorney's office ("the ADA") during some of the pendency of his first motion for a new trial and consolidated appeal created a conflict of interest that violated his right to counsel, Pet.'s Am. Mem. 1 [#158], and that the SJC's decision that "there was neither an actual conflict of interest nor a potential conflict that resulted in material prejudice in Stote's appeal," Stote II, 456 Mass. at 224, is "contrary to clearly established federal law" because, "[r]ather than following the federal standard concerning an actual or genuine conflict of interest, for which no prejudice need be shown, the Supreme Judicial Court discussed facts that the Court claimed did not show prejudice or adverse impact or adverse effect…" Pet.'s Am. Mem. 29 [#158]. Respondent contends that the "SJC reasonably concluded that there was no actual conflict of interest," Resp.'s Opp'n 23 [#159], see also id. at 29-30, appropriately applied "the performance/prejudice framework analysis mandated by Strickland," id. at 27, and "reasonably held that the petitioner failed to establish a potential conflict of interest that resulted in material prejudice to Stote's appeal." Id. at 30.

The SJC reasonably determined[38] that no actual conflict existed. Although the SJC relied on state law in finding no actual conflict, Stote II, 456 Mass. at 218, the First Circuit has found

---

[37] The court also agrees with the SJC that "[t]he prudent course of action would have been for Walsh to disclose that previous relationship and to give Stote the opportunity to consent or not to consent to the representation." Stote II 456 Mass. at 222 n.14.

[38] Where a state court has adjudicated the question of whether an actual conflict of interest existed on the merits, the appropriate standard of review is whether that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." See Teti v. Bender, 507 F.3d 50, 56 (2007) (noting that, where the district court determined that the state

that where, as here, "state law is explicitly more favorable to defendants than the federal standard, we will presume the federal law adjudication to be subsumed within the state law adjudication." Teti v. Bender, 507 F.3d 50, 56 (2007) (internal quotation and citations omitted). Petitioner has not proposed any "plausible alternative defense strategy or tactic" on appeal that "was inherently in conflict with or not undertaken due to" Walsh's relationship with the ADA. See U.S. v. Colon-Torres, 382 F.3d 76, 88 (2004) (citing U.S. v. Soldevila-Lopez, 17 F.3d 480, 486 (1994)).

Where Walsh's relationship with the ADA created only a potential conflict of interest, Strickland provides the appropriate federal standard by which to determine whether that potential conflict resulted in constitutionally ineffective assistance. The First Circuit has held that an analysis conducted, like the analysis in Stote II, pursuant to Commonwealth v. Saferian, 366 Mass. 89 (1974), is "a functional equivalent" to an analysis under Strickland. Ouber v. Guarino, 293 F.3d 19, 44 (1st Cir. 2002). Because Petitioner has identified no Supreme Court decision with materially indistinguishable facts in which the Court reaches a different result than did the SJC in Stote II, the SJC's ruling was not "contrary to" clearly established federal law. See 28 U.S.C. 2554(d)(2); see also Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012).

It is similarly not the case that the SJC "correctly identifie[d] the governing legal rule but applie[d] that rule unreasonably to the facts" in a manner "so lacking in justification" that it is "beyond any possibility for fair-minded disagreement." See White v. Woodall, 134 S. Ct. 1697, 1702, 1706 (2014). The SJC explained:

> Stote argues on appeal that, because of Walsh's relationship with the ADA, Walsh failed to argue that he was burdened by a conflict of interest *at trial* arising from his previous intimate relationship with the trial prosecutor, depriving

court had not adjudicated a conflict-of-interest claim on the merits, it reviewed it *de novo* "instead of applying § 2254(d)(1)'s highly deferential standard").

Stote of the effective assistance of appellate counsel. We disagree. First, the judge
found that the intimate relationship between Walsh and the trial prosecutor had
ended seventeen years before Stote's trial and gave rise to no actual conflict of
interest…

Stote also argues that Walsh, as his trial counsel, deprived him of effective
assistance due to various failures and omissions at trial, such as failing to
investigate and develop certain evidence that would have supported Stote's
defense…Accordingly, to obtain relief on this basis, Stote would have to show not
only that the asserted failures at trial constituted ineffective assistance of counsel
(that is, that if these asserted failures had been raised in Stote's direct appeal, the
conviction would have been reversed), but also that the relationship with the ADA
was what prevented Walsh from raising such claims in the direct appeal.
Whatever the merits of the former element, Stote cannot establish the latter. Stote
offers no reason to believe that, but for the relationship, Walsh would have raised
these issues and thereby accused himself of ineffective assistance. Put another
way, supposing that Walsh had not been involved in a relationship with the ADA
or anyone else in the district attorney's office and that he was therefore under no
potential conflict of interest, he nonetheless would not have argued in the direct
appeal that he deprived Stote of effective assistance at trial. In these
circumstances, the relationship did not affect the arguments raised in Stote's
direct appeal. Stote has not shown that any potential conflict of interest arising
from his attorney's relationship with the ADA resulted in any material prejudice
to him.

Stote II, 456 Mass. at 222-224 (internal citations omitted) (emphasis in original). This analysis is

sound. As such, the SJC did not unreasonably apply established federal law in finding that there

was no "potential conflict that resulted in material prejudice in Stote's appeal." See id. at 224.

V.      Conclusion

Accordingly, Petitioners Re-filed Amended Petition Under 28 U.S.C. § 2254 for Writ of

Habeas Corpus by a Person in State Custody [#63] is DENIED.


IT IS SO ORDERED.

Date: October 13, 2020                                    /s/ Indira Talwani
                                                         United States District Judge